Good morning, Illinois Appellate Court, 1st District. Court is now in session. The 4th Division, the Honorable Justice Robert Gordon presiding, case number 1-9-0-8-7-0, People v. Daniel Bryant. Hey, good morning. Would the lawyers who are going to argue the case please introduce yourself to the court? My name is Peter Sullivan. Through the Supreme Court Pro Bono Program, I'm representing the appellant, and I apologize. I had the wrong code to join the meeting, but I have it now. Thank you. I think you need to mute yourself, demute yourself. It doesn't show her muted, so I don't know. She's trying to sign back in. Hold on, please. Mr. Sullivan, while we're waiting to hear, thank you so much for taking the case from the Pro Bono Program. We really appreciate it. We need more people like you. It was my pleasure. I enjoy this. Well, except for the oral argument. Can you hear me now? Now we can hear you. I had that same problem last time. I had to rejoin the meeting to have my audio work. I don't know why. Okay, introduce yourself to the court, please. My name is Marcy Jacobs. I'm an Assistant State's Attorney representing the people of the state of Illinois. Okay. All right, Mr. Sullivan, are you going to reserve some time for rebuttal? I think I'll need five minutes. Yes, Your Honor. Okay, well then let's proceed with your argument. Okay, thank you, Your Honor. As you know, Mr. Bryant was charged, convicted, and sentenced on aggravated battery of a child under 13, of a child who was babysitting in the home. I believe the testimony of the experts, much of which is undisputed and relevant part, negates the possibility of the finding of a beyond reasonable doubt and the circumstantial evidence that the state pulls together, I don't think, overcomes that cable flaw. The basic facts, I believe you know, at about 3.30 on January 12, 2017, Mr. Bryant was alone with two children while the mother went out on a marriage. The grandmother came home at 4.30, and one of its friends was in deep distress, difficulty breathing, losing consciousness, requiring immediate medical assistance. She was brought to the St. Alexis Medical Center, intubated, on physical exam. There was no evidence of any fracture, no bruises, no cuts, burns, anything like that. You're not having some difficulty understanding you. Is anybody having difficulty with you? No, I'm okay. Okay. Yeah. It may be that you're speaking fast. Mr. Sullivan, I have a question. Sure. So with regards to the incident itself, during the interview with the police officers, there appears to be some very inconsistent statements. You know, he first mentioned the fact that he finds her, she's in the crib, she's not breathing. Then later on, you know, he's carrying her. At one point in time, you know, he drops her. And then the next point in time in his statements, you know, he drops her and falls on top of her. You know, they incidentally headbutt. What about all these apparent inconsistencies? They're obvious inconsistencies. And he did change his story. And if it helps, I can go through the various changes. But they are inconsistent. And I could read the interview as a, explain each one of those differences as it goes along. But clearly, he didn't want to be blamed for this. He didn't want any criminal responsibility. He didn't want DCFS involved. The mother was already under investigation for that. So he wanted to be blameless. He wanted it just to happen on its own. That was obviously idiotic of him. And then he confessed to dropping her and falling on top of her, which seems pretty brutal to me. I don't know why that wasn't accepted. He did lie about it that at first because he said, Oh, well, she was fine after I dropped her. And that was obviously not the case. So then after the overnight in jail, without getting his medication yet, the next day, he just looked exhausted and just said whatever they wanted to say. They wanted him to say he shook, he swung or shook the child, because that's the only story they would take. They were really berating him for lying anytime he denied what they wanted him to say. So that's the story. It's a story of somebody who is not a criminal, allowing themselves to be interviewed like that, wanting to protect himself wanting to protect his family. And he shouldn't have even consented to the interview, but he did. And he was trying to be helpful, but also be blameless. And it is what it is. It's he's not a very sympathetic gentleman. He, he's disabled with a needs a cane to walk. He takes a cycle. He takes fluoxetine and antidepressant. He takes marijuana because his backache. He was abused sexually as a child. He doesn't work. He's on disability. He's living in his sort of mother-in-law's bedroom. And so it's easy to say, Well, he's just an idiot. He is. He is lying just because he's a selfish bastard. But if you look at him, if you really look at what he's done, he stepped up with his children. He he's not only known them since they were born and lived with them since they were born, but he he and he's not the biological father. Yet he became engaged to release was in a relationship with the mother when she was three months pregnant and never since then. And then afterwards he stuck around even though she's bipolar. And even though she went to postpartum depression and, and he was there, he was there for them. So he's the kind of guy who people can easily prejudge and sit and not, and just look for him to slip up because, you know, before he talks, he's, he's, he's not a very sympathetic guy. He's going to be prejudged, but, but that doesn't really stand up in the court of law. And it doesn't. It's, it's just unfair to look at him that way without the evidence. He's clueless. He's in a, in a criminal justice. I have another question during the interview. There's a point in time when the police officers leave him alone in the interview room that he's speaking out loud and he's speaking to himself. And he's, he says that he didn't mean to himself. He says, you know, I didn't mean to shake. I didn't mean to shake the baby. So can we, I didn't mean to, I think it says swing her or shake her because he's been, this has been drilled into his head that he did this and he goes, I don't, I didn't, I didn't, I didn't. So he's going to say it again. I didn't shake her. And the, the, the briefs on both sides, try to focus in on whether that is an independent statement or whether that's a continuation of the earlier things, two things about the DV, the video that you should remember on, you know, one is that the transcript is not, it's not an evidence. It's just the, uh, the DV here that just to make it easier for, for the justices. And the other thing that's interesting is that because it's non-testimonial evidence, you don't have to give any deference to the judge's reading of that. So you're free to interpret it yourself. Just thought I'd point that out. Okay. Thank you. Hey, uh, you want to reserve some time, uh, for rebuttal or something else you want to tell us at this point? Well, uh, I will take two minutes, two more minutes because I said, I made a bold claim at the beginning and I have to explain that the medical evidence, um, shows that the injury it's undisputed could have happened two or three days earlier. So we don't know the time of this medical evidence shows that she could have had VEH, a benign, uh, disease that causes brain pressure and swelling and could act just like the subdural hematoma. The hematoma, because the, um, there's evidence that the people's expert didn't see when he made the diagnosis, he didn't know about, um, her, her fast growth of her head circumference when she was young was more than twice the normal. The, she was premature. Um, the, uh, the neurosurgeons detected clear fluid when it was an acute injury, it should have been bloody red. And there was extra space between the door and the brain, which is very unusual and can't be explained. So there was something going on with this child and the, uh, the state's expert couldn't rule it out. And they, as far as it hadn't happened and the, uh, they both agreed that she did have it. Wouldn't take a criminal act to cause the kind of hematoma that she had. So, um, between that and the fact that I believe the state is changing its theory, we don't know what he's being charged with, what he actually did to cause this, if he did anything. And, uh, I think I explained why that's the medical point of China. I'll, I'll reserve the rest for any results. Thank you. Does anybody have any questions? Uh, this is Lampkin. You have any questions? Can you hear me? I said no. This is Reyes. Do you have any further questions? No, no. Thank you. Okay. Let's hear from the state. Good morning, your honors council. Um, I do want to start off by clarifying a couple of points. Um, the people did not change their theory on appeal. Um, the issue defendant has raised is the sufficiency of the evidence. Uh, and so the question is, what did the evidence show? Whether a rational try or effect, uh, could find the defendant guilty based on that evidence. Um, and not necessarily what was argued below. Um, but our theory is, and always has been that it was defendants, violent shaking of serenity that caused her catastrophic injuries. Um, this is based on Dr. Dunham's testimony about the acceleration and deceleration forces, uh, where the brain is hitting the back and the fourth of the skull, uh, back in front of the skull, which causes the brain to bleed and also causes the capillaries and small blood vessels in the retinal space to a rupture and bleed. Um, these are the main features of shaken baby. Um, it was only in response. Oh, I have a question. What about, uh, the defendant's argument that there were no contusions, no abrasions, um, no, no evidence of, you know, outward, uh, physical force applied, uh, to the child. Um, our expert was very clear. Um, the theory that defendants expert put forth that only, uh, you can only have these injuries if there's also impact has been completely debunked. Um, I wrote all about that in my brief. Um, that is not, uh, that is a theory that a small group of defense experts go around the country and, uh, they use, uh, they use studies that are inaccurate, uh, the lowest level of evidence they're methodically flawed. Um, that is why the consensus statement that I put in my brief explains why they need a consensus statement to explain to courts and to the legal system, what is happening out there. Um, there's no question that shaking alone can produce those injuries. Um, but I do want to point out, um, so it was just in response to the defendant's experts, um, uh, uh, testimony on that point that nonetheless, there is, uh, that the record here is replete with evidence of, of content, of, uh, of impact anyway. Um, with defendant admitting, uh, dozens of times that he dropped the baby and with the defendant's expert admitting that he did not even know about defendant statement admitting to dropping the baby. Um, next I want to clarify, uh, defendant, uh, says that, uh, he never said in the videotape that he shook serenity or even swung her pretty hard. And that because he didn't, his videotape doesn't support, um, his finding of guilt. He did say both of those things. The words pretty hard did not come out of the D the detective's mouth. That was an error on the transcript, um, that, uh, was submitted to this court. They came out of the defendant's mouth, um, and defendant acknowledged that in his opening brief. Um, so it was the defendant who described, who said the words, uh, when he was talking about swinging serenity, he used the word swishing, swinging, swishing. I'm not sure there's much of a difference. Um, and so, uh, he said that he did it like a jolt pretty hard. And that was what the trial court heard. He heard the videotape. He did not see the transcript that was, uh, uh, that was prepared after the fact. And that's why the trial court used defendant's own words in making his findings. Um, and again, um, when we talk about to justice Reyes's point about, um, yeah, the defendant, uh, def denied that he shook her all many times to the detectives, but we're going to at the demeanor and we have the benefit of the video to look at his demeanor and the context in which he finally did admit that he shook her. And he didn't say, I, he said, I didn't mean to drop her or shake her, which is very different than saying I didn't shake her. He said he did. He said he shook her. He just tried to convince himself. He didn't mean it. Um, so that was the only time he actually did admit that he shook her. Um, and this is evidence that we view in the most favorable to the state. Um, and defendant wants you to view it in the light, most favorable to him by claiming that his statements were in actions were due to him blaming himself for this, for this accident. Uh, but that's not the standard. And he didn't merely blame himself blame. Anyway, he, he denied anything happened. He blamed the mom with the blankets in the crib. Uh, then he's story, which he embellishes with all sorts of details, which he later admits he lied about. And then we end up, uh, he throws in the, the shaking, the swinging pretty hard with a jolt. And then, and then he lands on in the end, uh, he just dropped her by the crib and then into the crib. So the whole trip and fall in the end, he admitted that. I'm sorry. He just lied and lied. And he just lied about his lies. Um, I counted up about 15 different stories. Um, and in fact, it should be pointed out that he knew he was in trouble before the police even became involved because the minute they, the, the ambulance took serenity out of there, he's on the phone with mom crying, worried. He's in trouble, uh, trying to say, I didn't do anything all defensively. Um, and then you look at those four videotape statements and that I want to talk about those because defendant claims, Oh, he wants the impression. These were unrelenting, some kind of heated acrimonious interrogations. Hopefully this court watched them all and saw that that was not the case. These were four statements over two days. The longest was 36 minutes. The shortest was nine minutes. And that included conversations, including background, how he met the mom, how the housing situation, how they, all of that stuff. Um, this, this was the video show that they were conducted in a calm and respectful manner, even though the subject matter was a catastrophically ill baby. Um, the word shaking was not mentioned at all in the first interview. That was the longest one. It was not mentioned until the last two minutes of the second interview. Um, but I do want you to look at those interviews and I do want you to see that his demeanor, and there were some very telling moments. He admitted at one point that he needed a break from serenity because she was crying and he didn't know what to do. Um, at one point after he got caught in up in all of his lies, he says, it's all my fault. I'm a bastard. Um, at another point in the last interview, um, he said serenity was crying. He didn't know how to handle it. So he did something stupid. He didn't want to do. Um, so we consider his demeanor. This is all in context of, in the light, most favorable to the people. Um, this is all in the context of him being high in marijuana at the time of him having his anger management problem, the drinking problem. You know, he said, he, he said that his antidepressant helps with his anger management problem. Who knows if it does, who knows if he took it, he lied about everything else. Who knows how it interacted with the marijuana he admitted he was smoking. Um, so with the evidence of his consciousness of guilt before the police even were involved, his multitude of lies and his actions trying to minimize them. Um, there's no question that, uh, his video statements support his guilt. Um, and I want to touch on one more thing. And, um, I do want to talk about, um, a defendant is asking this court to reweigh the evidence with which of course it can't do, but he's wants you to reweigh it with testimony from an expert in people versus Johan, another case entirely, which of course it can't do, but it doesn't matter because what that expert testified to is not at all. What Dr. Abram testified to doesn't support it. Um, the expert in, um, Dr. Abram testified that retinal hemorrhages, uh, are a result of that the blood traveled from a subarachnoid hemorrhage that that baby had to the retinal space and appeared as retinal hemorrhages. And that that particular anatomy of the subarachnoid space, he noted that in making the finding, well, um, that's very different than intracranial pressure, um, causing the retinal hemorrhages. And besides the fact, um, serenity did not have subarachnoid hemorrhages. Those are a different, that's a different space in the brain. It's a different brain bleed. But what she did have was parenchymal bleeding. She had subarachnoid, she had subdural bleeding and parenchymal bleeding, which is inside the brain. And that's something that Dr. Abram completely ignored. He never mentioned it. He never addressed it. Um, and he never explained it. And so when counsel talks to you about the fact that, um, serenity may have had this, um, preexisting condition of BEH. Um, the only thing that any experts said about BEH at best is that it might cause subdural hemorrhages, but it in no way causes retinal hemorrhages. Our experts said that, and it does not cause, and there's no testimony that how to that the trial court is not required to accept the opinion of Dr. Abram over the state's witness. And it didn't in this case, um, his credibility assessment must be given deference. Um, he found that, uh, Dr. Deneb testimony was much more credible and persuasive, um, and very clear compared to Dr. Abrams. Um, a cold reading of the record shows that Dr. Abrams testimony was appeared less than reliable with all of his lack of certainty and his about basic things and his sloppy reading of the records. Um, all of the stuff I outlined in my brief, um, but in the, but I do, and I want to talk about that Dr. Abrams past experience, all he talked about was he treated brain tumors, behavioral problems, ADHD, muscular dystrophy, Caesars. He never talked about one single case of treating anyone with injuries, similar to serenity, her subdural hematomas and her retinal hemorrhages. And in fact, he was very opaque and outright refusing to talk about how many child abuse cases he worked on, or even how many cases he worked on in the PICU. Um, and, um, so the record supports the trial courts finding that his testimony was unreliable. Um, and you who they criticize the criticism of Dr. Dana from defendant is that his role was limited because he consulted with other types of specialists. Now this is quite baffling because he saw serenity from 45 minutes after she was admitted to the ER up until he was still seeing her at the time of trial. Um, and, and I do think that gaining input from other specialists, uh, the ophthalmologist, the pediatric neurologist, the neurosurgeon, the radiologist, the ER doc, the social workers, this multidisciplinary assessment, um, is probably preferable in a diagnosis than just looking at paper records and, and, and misreading them as Dr. Aburn did. Um, so the defendant has provided this court with no reason that it should reweigh the evidence, um, and substitute its findings. The fact that we're well supported by the record. Um, we asked this court to affirm defendant's conviction, uh, where the evidence of serenity is perfectly healthy condition prior to, uh, being in defendant's care, uh, defendant's actions of his consciousness of guilt, um, and his statements admitting, but minimizing his actions and the medical evidence all viewed in light most favorable to the state support his conviction. Thank you. Any questions by members? I have none. Okay. Let's hear the rebuttal. Okay. Iran is very quickly. Um, the medical evidence that I've taken for this appeal are the parts that are undisputed. I'm not trying to set up a fight between the two experts. The other thing is that, uh, I don't think Dr. Denev mentioned Karen Chamo other than reading from the report. That's one, it's one of the, one of the, uh, things that happened to her. We're not debating that, but I don't think he mentioned that at all. I don't think it was even defined in the testimony at all. It kind of became irrelevant to both doctors. Um, the, uh, I, I don't know enough about medicine to say whether that's right or not. Um, and also Mr. Dr. Denev had 25 years as a, uh, as a pediatric neurologist, he had more specialization, he had more experience than Dr. Denev. And I think if you look at the testimony of Dr. Denev, you'll see there are things not just, he has to consult others because he doesn't know himself. So I just think Dr. Denev was put up on a pedestal when there was no pedestal. Um, as far as the tape is concerned, um, the, I don't know if there, I think you have to look at a minute 26, second 56 to see what the accurate transcription is. I don't, I have it as the transcript is, and I just tell you where to look and you can make up your own mind. Um, as, and, uh, of course, Mr. Bryant feels horrible, horrible about he, he, he being responsible for these injuries. He was with her, he fell down or dropped her with every, I believe it's trip, but the, uh, whatever it was, he knows he's responsible and he loves his child and his whole life has been this, this family for the last year at least. So, um, I just said, put yourself in his place and see what kind of reaction you would have. Um, um, and you have to see the physical, his physical recreation of that so-called swinging. Yes, he didn't think he was swinging the child. Oh, I just thought of something I did. Maybe that's when he, and he just asked and the doctor said, no, that couldn't be it. That wasn't a perfect child. And so, but of course you would fall on top of the child. It's a different story. Um, and he was told to take time out. The doctors, the pediatricians told the parents to, when the child gets quality, which they have a tendency to do, just take a time out from her and then come says, that's what he's doing. He's trying to follow doctor's orders. Um, and the, as far as the, uh, the certainty and uncertainty, it was Dr. Dennis who spoke in more uncertainties than did Dr. As far as the, uh, uh, um, intracranial pressure causing retinal hemorrhages. Um, he said it was a double negative, but he didn't believe it was extremely likely that the retinal hemorrhages were the results of intracranial pressure, but he suggested that that was a question. Ask a neurosurgeon. I don't know. And that was at record page 367. So I think it's more of a matter of qualifications and credibility when it comes to the two doctors. Um, okay. Um, I think I responded very, very thorough. Um, if I may compliment myself, um, we both spent a lot of time on this and we both, uh, can see the details, but of course, thank you. Thank you. Uh, any questions by any members of the panel? No, no, no further questions. I have no questions. I would like to say this. It is a sad case. Um, I was a trial judge and tried three or four shaken baby cases. I was very unhappy to see that this was one, uh, when I opened it up. So I think, I think you both did, uh, uh, what you could do on this case. And, uh, we, we thank you. Yes, we do. We do. We thank you very much. And, uh, you'll have a decision from us, uh, very shortly in the court. We'll, uh, uh, uh, now, uh, uh, be adjourned for a short period of time, and then, uh, we will hear another case.